**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| State of Florida, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Food and Drug Administration, *et al.*,<br><br>Defendants. | Case No. 8:22-cv-01981-TPB-JSS |

**Defendants' Motion for Partial Summary Judgment on Counts One and Four**

The Department of Health and Human Services ("HHS"), the Food and Drug Administration ("FDA"), and their respective heads (collectively, "Defendants"), seek partial summary judgment on Counts One and Four of the Amended Complaint because, as the administrative record demonstrates, FDA's decision on the State of Florida's (the "State") proposal to import prescription drugs from Canada has not been unlawfully withheld or unreasonably delayed. FDA has been, and remains, actively engaged with the State about information that is required for the proposal to be eligible for authorization, but which is still outstanding. Indeed, the agency currently awaits a further submission from the State. As such, no basis exists for this Court to compel FDA to issue a final decision on Florida's proposal.

In fall 2020, HHS and FDA brought into effect a novel statutory pathway for the importation of lower-cost prescription drugs from Canada. Pursuant to Section 804 of the Federal Food, Drug, and Cosmetic Act (codified at 21 U.S.C. § 384) and 21 C.F.R. Part 251, a State or Indian tribe may submit to FDA for review a Section 804 Importation Program ("SIP") proposal to import eligible prescription drugs from Canada. FDA may only authorize the proposal if it meets applicable regulatory requirements demonstrating that the SIP would pose no additional risk to the public's health and safety and would result in a significant reduction in the cost of covered products to the American consumer. A SIP sponsor (*i.e.*, a state or tribe) bears the burden of providing information to FDA to demonstrate that its proposal meets the requirements of authorization.

Florida submitted a preliminary SIP proposal in November 2020. Since then, the State has revised its proposal three times to supply missing information. Two of the three revisions were prompted by FDA outreach. Most recently, in November 2022, FDA sent Florida a 15-page letter that identified deficiencies that preclude authorization and requested information necessary to resolve those deficiencies. Florida has not yet responded to FDA's request.

Despite FDA's collaborative approach to processing Florida's SIP proposal, the State seeks, under the Administrative Procedure Act ("APA"), to compel a final agency decision on its SIP proposal. However, as explained in FDA's

November 2022 letter, the State has not yet made the required showing for authorization of its proposal. FDA's decision to work with Florida rather than deny the State's proposal outright does not merit judicial intervention. This Court should grant summary judgment to Defendants on Counts One and Four.

## BACKGROUND

In 21 U.S.C. § 384, Congress created a potential pathway for the importation of prescription drugs from Canada under certain circumstances. *See* 21 U.S.C. § 384(b); *see also id.* § 381(d)(1)(A)–(B) (exempting importations under "section 384 of this title" from otherwise applicable restrictions). For this statutory pathway to become effective, the Secretary of HHS had to certify to Congress "that the implementation of this section will- (A) pose no additional risk to the public's health and safety; and (B) result in a significant reduction in the cost of covered products to the American consumer." 21 U.S.C. § 384(*l*)(1). On September 23, 2020, the Secretary certified that the commercial importation pathway in 21 U.S.C. § 384(b)–(h) could be implemented in accordance with 21 U.S.C. § 384(*l*). Answer, ECF No. 26, at ¶ 41. "The Secretary's certification [wa]s based on the requirements and safeguards" in the concurrently issued Importation of Prescription Drugs Final Rule. 85 Fed. Reg. 62,094, 62,113 (Oct. 1, 2020) (the "Rule").

**I. SIP application and authorization process**

The Rule, codified at 21 C.F.R. Part 251, provides for the implementation of 21 U.S.C. § 384 "through time-limited" SIPs, "which will be authorized by FDA and managed by States or Indian Tribes." 85 Fed. Reg. at 62,094. Under an authorized SIP, a State or Indian Tribe would manage the importation of certain prescription drugs that "could be sold legally on either the Canadian market or the American market with appropriate labeling." *Id.* Specifically, a Canadian "Foreign Seller" would purchase eligible prescription drugs *directly* from the manufacturer and sell them *directly* to the U.S. "Importer." *Id.* A Foreign Seller is a wholesaler licensed by Canadian authorities and registered with FDA. *Id.*; *see* 21 C.F.R. § 251.2. An Importer is a wholesale distributor or pharmacist licensed in the United States. *Id.* However, before any such prescription drugs can be imported, FDA must authorize the SIP.

"[I]n accordance with the Secretary's certification," the Rule was "designed to ensure that any authorized SIP poses no additional risk to the public's health and safety and results in a significant reduction in the cost of covered products to the American consumer." 85 Fed. Reg. at 62,113. A critical aspect of that design was the comprehensive proposal process.

A SIP application must contain both "an overview" of the proposed SIP and a more detailed "importation plan." 21 C.F.R. § 251.3(c). The overview and

importation plan must, in turn, include a significant amount of substantive information. *See id.* §§ 251.3(d)–(e). For example, a proposal must:

- identify and provide detailed supporting information about the Canadian Foreign Seller and the U.S.-based Importer;
- identify the eligible prescription drugs to be imported, including specifics about the ingredients and dosages, as well as provide evidence of commercial marketing status and current labeling;
- describe how testing will be conducted to ensure that the drugs are authentic, not degraded, and meet established statutory specifications and standards;
- explain, so as to permit a meaningful evaluation, how the SIP will result in a significant reduction in the cost to the American consumer of the eligible prescription drugs to be imported;
- describe the procedures and steps to ensure the SIP supply chain is secure;
- explain how pharmacists, health care providers, and other third-parties will be educated about the SIP;
- include plans for the recall of drugs distributed through the SIP, for the return of saleable and non-saleable drugs, and for other

compliance measures, such as whistleblower communications and the handling of conflicts of interest; and

- explain how any confidential commercial information received under the SIP would remain protected.

*See id.*

Only a proposal "that meets the requirements of" 21 C.F.R. Part 251 may be authorized by FDA. *Id.* § 251.4. Conversely, FDA "may" deny any SIP proposal that "does not meet the [regulatory] requirements." *Id.* Even if a proposal "meets the requirements of" Part 251, the agency retains discretion to "decide not to authorize" it for a variety of reasons. *Id.* These include "potential safety concerns with the SIP," uncertainty that it "would adequately ensure the protection of public health," and "the recommendation of another [HHS] component" regarding "the relative likelihood that the SIP Proposal . . . would not result in significant cost savings to the American consumer." *Id.*

The regulations provide no specific timeframe in which FDA must complete its review of a proposal. In fact, when promulgating the Rule, the agency lacked "sufficient information to estimate a timeframe for the review of a SIP Proposal," due to the program's novelty and the potential complexity of proposals. 85 Fed. Reg. at 62,103. FDA also understood the evaluation process would likely be iterative, stating in the regulations that it would make a reasonable effort to

notify Sponsors "about any information required by [21 C.F.R.] § 251.3 that was not submitted in a SIP Proposal" and whether "additional information would help FDA's review." 21 C.F.R. § 251.4(c).

### II. Florida's preliminary and three revised SIP proposals

In November 2020, Florida submitted to FDA a "Preliminary Section 804 Importation Program (SIP) Proposal." AR 29–141.[1] As Florida acknowledged, that proposal was incomplete because the State remained "in the process of identifying a foreign seller" and intended to "update its SIP application" with this required information within the time permitted by regulation. AR 33; *see also* AR 36 (stating that information provided in a seven-page chart in the proposal was "preliminary"). In April 2021, Florida submitted its first revised proposal, which identified the Foreign Seller. *See* AR 142–266.

In August 2021, after reviewing the first revised proposal, FDA informed Florida about information missing from the cover sheet, overview of the SIP proposal, importation plan, and compliance plan that were "not provided" but were "required pursuant to the final rule." AR 267–68. The next month, the State furnished a second revised proposal and expressed its "pleas[ure]" at the

[1] "AR" denotes citations to the administrative record, filed at ECF Nos. 37–42, with pincites to the Bates numbered page.

administration's "continued support of Section 804 programs." AR 270–401; *see also* AR 402–4452 (documentation accompanying second revised proposal).

In November 2021, FDA alerted Florida to discrepancies in the second revised proposal about the "agreement with a proposed Foreign Seller" and "the list of eligible prescription drugs" covered by the proposal. AR 402. In response, the State submitted its third revised proposal. AR 4455–4580.

In May 2022, FDA informed Florida that it would send another request for information, but "a number of complicated issues" remained under the agency's consideration. AR 4598, 4600. As FDA later explained, "numerous subject matter experts at FDA and other components of HHS" were "carefully and thoroughly review[ing]" Florida's SIP proposal. AR 4602. On November 16, 2022, FDA sent Florida a 15-page letter discussing the outcome of that review and requesting further information from the State. AR 4602–16.

### III. FDA's detailed November 2022 evaluation of Florida's proposal

The November 2022 letter catalogued numerous deficiencies in core aspects of Florida's proposal. *See id.* For example, with respect to the testing requirements mandated by statute, *see* 21 C.F.R. §§ 251.3(e)(7), 251.16, the proposal was "general in nature and lacks information . . . related to the specific testing that will be done to establish that the" Canadian version of a drug "meets the conditions" for "the FDA-approved counterpart," AR 4604; *see id.* (requesting

"a description of and information about specific testing, analytical procedures and methods, and related acceptance criteria"). The proposal also lacked "specific written compliance policies, procedures, and protocols that have been created as part of the SIP's compliance plan," as well as "a written policy regarding handling trade secrets or commercial or financial information that is privileged or confidential." AR 4605–06; *see* 21 C.F.R. § 251.3(e)(15)–(16).

The proposal also lacked information regarding post-importation and supply chain security requirements. It failed to include sufficient information about contingency plans for the recall and return of drugs. AR 4610–11; *see* 21 C.F.R. §§ 251.3(e)(13), 251.18(e)(3); *see also id.* § 251.3(e)(14). It also neglected to "describe how the Importer will fulfill its post-importation pharmacovigilance obligations,"[2] as well as its monitoring and reporting requirements for adverse events. AR 4610; *see* 21 C.F.R. § 251.3(e)(11).

Because Canadian drugs imported under a SIP must be relabeled to comply with U.S. law, *see* 21 C.F.R. § 251.13, Florida's proposal must include the following information for any drugs the State seeks to import: [1] "a copy of the FDA-approved drug labeling for the FDA-approved counterpart of the eligible prescription drug"; [2] "a copy of the [Canadian]-approved labeling"; [3] "a copy

[2] Pharmacovigilance means the data gathering activities relating to the detection, assessment, and understanding of adverse events for a drug.

of the proposed labeling that will be used [by the SIP] for the eligible prescription drug"; and [4] "a side-by-side comparison of the FDA-approved labeling and the proposed labeling," *id.* § 251.3(e)(8). It currently does not. *See* AR 4612. In addition, Florida's proposed labels impermissibly deviated from the FDA-approved labeling, omitted required information, and also contained "spelling and formatting errors." AR 4613–14.

Finally, Florida's proposal must explain how it will "result in a significant reduction in the cost to the American consumer of the eligible prescription drugs" and "be sufficiently detailed to allow for a meaningful evaluation." 21 C.F.R. § 251.3(e)(9). Although the State "project[ed] over $150 million dollars [*sic*] in annual savings," AR 4475, FDA found the proposal did "not include the details necessary to enable" even the "first step of cost savings evaluation," AR 4606. The agency nonetheless offered the State several pages of information about how to demonstrate cost savings. *See* AR 4606–10.

These documented deficiencies would have justified denial of Florida's proposal. *See* 21 C.F.R. § 251.4(a). Instead, in light of the "shared goal" of significantly reducing consumers' prescription drug costs without posing additional risk to health and safety, AR 4602, FDA offered the State an opportunity "to provide the additional required information" or "to withdraw the current submission and resubmit at a later time," AR 4616.

### IV. Florida sues to compel a ruling on its proposal

On August 31, 2022, Florida filed the Amended Complaint against Defendants. Am. Compl., ECF No. 7. Count One alleged that FDA had violated the APA, 5 U.S.C. § 706(1), by unreasonably delaying and unlawfully withholding a determination regarding Florida's SIP proposal. *See* Am. Compl. ¶¶ 86–103. Count Four alleged, in part, that Florida is entitled to a declaratory judgment "that Defendants have been and are violating the law" for "the same reasons described in Count[] 1." *Id.* ¶ 116.[3] On November 7, 2022, Defendants answered the Amended Complaint.

On December 13, 2022, the Court acknowledged the presumption that "agency inaction cases," like this one, are decided on "the administrative record." Order, ECF No. 34. Accordingly, FDA filed the administrative record. ECF Nos. 37–42. Defendants now move under Federal Rule of Civil Procedure 56(a) for partial summary judgment on the APA claim in Count One and the related request for a declaratory judgment in Count Four.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a party may move for—and a court shall grant—partial summary judgment on a claim when "the movant is

[3] The Amended Complaint also alleges two claims under the Freedom of Information Act. Those claims are receiving special handling, *see* Case Mgmt. & Scheduling Order, ECF No. 44, at ¶ 2, and are not the subject of this motion.

entitled to judgment as a matter of law." In cases subject to "the judicial review standards of the APA," "the normal rules of summary judgment do not apply." *St. Johns Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 462 F. Supp. 3d 1256, 1270 n.6 (M.D. Fla. 2020). Instead, the "district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." *Brinklys v. Johnson*, 175 F. Supp. 3d 1338, 1349–50 (M.D. Fla. 2016) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). That question is "whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Brinklys*, 175 F. Supp. 3d at 1350 (quoting *CS–360, LLC v. U.S. Dep't of Veterans Affs.*, 101 F. Supp. 3d 29, 32 (D.D.C. 2015)); *see St. Johns Riverkeeper*, 462 F. Supp. 3d at 1270 n.6.

Under 5 U.S.C. § 706(1), which supplies the applicable APA standard of review, a court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." "'In the context of a claim of unreasonable delay,' the Court must consider whether the agency's failure to respond is 'so egregious' as to warrant relief." *Ctr. for Sci. in the Pub. Int. v. U.S. FDA*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014) ("*CSPI*") (quoting *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984) ("*TRAC*")). If so, "a court can compel the agency to act, but has no power to specify what the action must be." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004).

## ARGUMENT

FDA's ongoing evaluation of Florida's SIP proposal is not "so egregious" that the Court should order the process to conclude. *TRAC*, 750 F.2d at 79. This conclusion flows from applying the D.C. Circuit's *TRAC* factors, which district courts in the Eleventh Circuit have looked to for help "in analyzing unreasonable delay claims." *Lara Santiago v. Mayorkas*, 554 F. Supp. 3d 1340, 1353 (N.D. Ga. 2021).

According to the *TRAC* factors, (1) "the time agencies take to make decisions must be governed by a rule of reason"; (2) "where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason"; (3) "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake"; (4) "the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority"; (5) "the court should also take into account the nature and extent of the interests prejudiced by delay"; and (6) "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." 750 F.2d at 80 (internal quotations omitted). These factors are not an "ironclad" standard; rather, they simply offer "guidance in assessing claims of agency delay." *Id.*

Nonetheless, as demonstrated by the administrative record here, these factors reveal no unreasonable delay by FDA in making a decision regarding Florida's SIP proposal.

## I. FDA has not unreasonably delayed ruling on Florida's novel and complex proposal

The first *TRAC* factor—the "most important" one, *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008)—and second factor collectively examine whether there is "any rhyme or reason—congressionally prescribed or otherwise—for FDA's delay," *CSPI*, 74 F. Supp. 3d at 300. The "reasonableness of the delay must be judged in the context of the statute which authorizes the agency's action." *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992) (quotations omitted).

Neither the statute creating the importation pathway, 21 U.S.C. § 384, nor the regulations in 21 C.F.R. Part 251 prescribe any deadline by which FDA must rule on Florida's proposal.[4] *See Kripke v. FDA*, Case No. 16-cv-1214-H-BLM, 2017 WL 6055045, at *6 (S.D. Cal. Feb. 2, 2017) (holding that FDA did not unreasonably

[4] The absence of a statutory deadline forecloses any alternative argument, under 5 U.S.C. § 706(1), that FDA has "unlawfully withheld a resolution of the SIP Proposal." Am. Compl. ¶ 103. An agency unlawfully withholds action only when it "fails to comply with a statutorily imposed absolute deadline." *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999); *see, e.g.*, *South Carolina v. United States*, 907 F.3d 742, 755 (4th Cir. 2018); *Ren v. Mueller*, No. 6:07-cv-790-Orl-19DAB, 2008 WL 191010, at *9 (M.D. Fla. Jan. 22, 2008). Here, the "organic statute"—21 U.S.C. § 384—does *not* "set[] a specific deadline for agency action." *Forest Guardians*, 174 F.3d at 1190.

delay action because, in part, "Congress has not provided a specific timeframe" for the agency to take action). Rather, the statute supplies two overarching principles that guide the agency's review of a SIP: commercial importation must [1] "pose no additional risk to the public's health and safety" and [2] "result in a significant reduction in the cost of covered products to the American consumer." 21 U.S.C. § 384(*l*)(1). A hasty review of a SIP proposal could result in a failure to follow those principles. As Florida elsewhere recognized, FDA must instead engage in a "careful and fulsome review of SIPs." Fla. Amicus Br., ECF No. 28, at 9, *Pharm. Res. & Manufacturers of Am. v. HHS*, No. 1:20-cv-03402-TJK (D.D.C. June 1, 2021). Such a review takes time and, as FDA previously explained, the first few proposals may take yet more time because "SIPs are new and unique programs which may be challenging to implement at first." 85 Fed. Reg. at 62,100.

Beyond the absence of a timeframe, the regulatory framework affords FDA great discretion in reviewing proposals. For example, FDA may not only deny a proposal that "does not meet the requirements of" 21 C.F.R. Part 251, but even if the proposal does meet them, the agency "may nonetheless decide not to authorize" a proposal for a variety of reasons, including "potential safety concerns with the SIP" and uncertainty about achieving "significant cost savings to the American consumer," 21 C.F.R. § 251.4(a). Florida's numerous deficiencies, *see* AR 4602–16, provided sufficient grounds for denial. Yet, rather than deny

Florida's proposal, FDA has repeatedly offered the State an opportunity "to provide the additional required information" or "to withdraw the current submission and resubmit at a later time." AR 4616.

By maintaining open lines of communication, the agency demonstrated its "commit[ment] to working with States such as Florida . . . that propose to develop SIPs." AR 4602. This collaborative spirit stems from a desire "to continu[e] to work with [the State] toward our shared goal." *Id.* It should not be mistaken for a dilatory approach.

The "complexity of" reviewing SIP proposals also signals that FDA has not unreasonably delayed a ruling. *CSPI*, 74 F. Supp. 3d at 301. "The more complex the petition, the more time an agency may need to adequately respond." *Id.*; *see also Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003) (stating that the reasonableness of any delay "will depend in large part" on the "complexity of the task at hand"); *Kripke*, 2017 WL 6055045, at *6. For example, in *CSPI*, the court considered FDA's delay of "several years" in responding to a petition "to initiate a rulemaking that would require" recommendations about seafood consumption "to be included in seafood labels and posted where seafood is sold." 74 F. Supp. 3d at 297. As the agency explained, it "was in the process of evaluating its overall approach to mercury in seafood" and preferred not "to act on a petition requesting mandatory labeling"

while that approach remained in development. *Id.* at 301–02. Despite the passage of several years, the court concluded any delay was "not unreasonable," given that the court "lack[ed] the competence to ascertain" how long it should take to resolve the scientific issues, which FDA "appear[ed] to be busy trying to address." *Id.* at 301–02, 304; *see also In re Pesticide Action Network N. Am.*, 532 F. App'x 649, 651 (9th Cir. 2013) (per curiam) (holding that EPA's six year delay in ruling on a petition "is not unreasonable in light of the complexity of the issue").

Here, both the novelty of the SIP program and the complexity of the public safety and economic issues presented by the State's proposal support FDA's deliberate approach. 85 Fed. Reg. at 62,103–04. Contrary to Florida's dramatically oversimplified portrayal, *see* Am. Compl. ¶ 90, SIP proposals generally present numerous complicated questions that span multiple disciplines, including economics (cost savings estimates), supply chain management (importation and distribution process), and information security (protecting confidential commercial information). Florida's proposal raises all these issues and others. Accordingly, "numerous subject matter experts at FDA and other components of HHS" examined Florida's proposal before the agency requested further information. AR 4602. Such a rigorous, substantive evaluation by subject matter experts takes time. *See CSPI*, 74 F. Supp. 3d at 301 (observing that courts

"routinely defer to the judgment of agencies when assessing timelines that involve complex scientific and technical questions").

Furthermore, the administrative record establishes that FDA "has not been twiddling its thumbs." *Action on Smoking & Health v. Dep't of Lab.*, 100 F.3d 991, 994 (D.C. Cir. 1996). On the contrary, the agency proactively informed Florida of problems with its proposal in August 2021, November 2021, and November 2022. *See* AR 267–69, 402–03, 4602–16. And Florida revised its proposal twice in response. Although the State has not yet addressed FDA's November 2022 letter, this substantive back-and-forth both accords with the regulatory design, *see* 21 C.F.R. § 251.4(c)(1), and belies any "breakdown of regulatory processes" that might mark "inordinate agency delay," *In re Int'l Chem. Workers Union*, 958 F.2d at 1149.

Far from an inordinate delay, the review period for Florida's proposal falls within those countenanced by courts in various scenarios. In the immigration context, "courts have generally found that . . . delays in excess of five, six, seven years are unreasonable, while those between three to five years are often not unreasonable." *Sarlak v. Pompeo*, No. CV 20-35 (BAH), 2020 WL 3082018, at *6 (D.D.C. June 10, 2020) (quotation omitted); *see, e.g.*, *Singh v. Napolitano*, 909 F. Supp. 2d 1164, 1176 (E.D. Cal. 2012) ("approximately four year delay" in ruling on immigration application "is reflective of a rule of reason" given "the complex

and extremely sensitive nature of the process”). Similarly, environmental issues may reasonably take years to resolve. *See, e.g.*, *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (holding that EPA estimate of four years to issue decision on petition for reconsideration was “reasonably proportionate to the gravity and complexity” of the issue, and thus did not constitute “unreasonable delay”); *Sierra Club v. Thomas*, 828 F.2d 783, 798–99 (D.C. Cir. 1987) (“Given the complexity of the issues facing EPA and the highly controversial nature of the proposal, agency deliberation for less than three years . . . can hardly be considered unreasonable.”). Thus, the two years in which FDA has reviewed Florida’s initial and three revised SIP proposals remains well within a reasonable timeframe for a decision of this complexity and novelty.

### II. Florida’s desire for a hasty resolution does not outweigh FDA’s mandate to protect health and safety

The third, fourth, and fifth *TRAC* factors collectively concern “the consequences of delay if the Court does not compel the [agency] to act,” *CSPI*, 74 F. Supp. 3d at 300, and whether such an order would harm any “competing or higher” agency priorities, *Skalka v. Kelly*, 246 F. Supp. 3d 147, 154 (D.D.C. 2017). For the third factor, in particular, the D.C. Circuit observed that “delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake.” *TRAC*, 750 F.2d at 80. Put another way,

courts grant agencies greater latitude when the consequences of a delay are primarily economic.

Florida submitted its proposal "as a component of the effort to reduce spending on prescribed drugs," in the hopes of "reap[ing] significant savings." AR 4459. Thus, the State's primary stated interest purportedly "prejudiced by delay," *TRAC*, 750 F.2d at 80, is in potential future cost savings. Yet even that is conjecture, given the proposal's barebones cost savings discussion. *See* AR 4606 ("[T]he SIP Proposal does not include the details necessary to enable this first step of cost savings evaluation.").

On the other hand, FDA's review is driven by concerns about "human health and welfare." *TRAC*, 750 F.2d at 80. "[P]ublic safety is its *raison d'être*" generally, *CSPI*, 74 F. Supp. 3d at 304, and the purpose of the SIP authorization process specifically. FDA must assess whether a SIP would "achieve a significant reduction in the cost of covered products to the American consumer *while posing no additional risk to the public's health and safety*." 85 Fed. Reg. at 62,094 (emphasis added); *see* 21 C.F.R. § 251.4. The agency and the American public have a profound interest in the rigorous vetting of SIP proposals to ensure they meet these requirements. *See Skalka*, 246 F. Supp. 3d at 154 (finding that agency action had not been unlawfully withheld or unreasonably delayed where "[e]xpediting

the agencies' delayed action . . . would certainly have the effect of harming the 'competing or higher priority' of accuracy").

The "judicial imposition of an overly hasty timetable" for resolving Florida's proposal "would ill serve the public interest" in safeguarding the public's health and safety. *United Steelworkers of Am. v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1120 (D.C. Cir. 1986); *see Skalka*, 246 F. Supp. 3d at 154 (declining to compel agency action because it "would insinuate the Court into the agencies' judgment about whether they could accurately adjudicate these cases," which was "at the very heart of the[ir] expertise"). This is particularly so here, when the record reflects FDA's active and repeated engagement with Florida regarding its proposal.

## III. There have been no improprieties in FDA's review of Florida's proposal

The sixth and final *TRAC* factor recognizes that "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." 750 F.2d at 80. "[I]n the unlikely event" that "evidence of bad faith" existed, it "would tend to favor" awarding relief, but an unreasonable delay claim may be adjudicated without such evidence. *Martin v. O'Rourke*, 891 F.3d 1338, 1348 (Fed. Cir. 2018). This factor also does not support Florida's position.

Florida baldly speculates that FDA is "[p]rotecting the interests of pharmaceutical companies." Am. Compl. ¶ 101. But that is the kind of "vague" and "improbable" accusation that does not satisfy this factor. *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991). "[N]or is there evidence in the record of impropriety or bad faith." *Tewolde v. Wiles*, No. C11-1077JLR, 2012 WL 750542, at *9 (W.D. Wash. Mar. 7, 2012).

Similarly, the State's attack on the November 2022 letter as "a stall tactic" misses the mark. Pls.' Opp'n to Mot. for Protective Order, ECF No. 30, at 8. Even a cursory review of the letter reveals that its issuance was not a pretextual exercise, as Florida claims; FDA's letter substantively assesses numerous, critical shortcomings in the State's proposal. *See* AR 4602–16. Further, the burden is squarely on the State to compile and present the required information in its proposal, *see* 21 C.F.R. § 251.3(c)–(e), *not* on FDA to fill in the gaps.

Thus, "[t]here is nothing to suggest impropriety," *Hidalgo Canevaro v. Wolf*, 540 F. Supp. 3d 1235, 1245 (N.D. Ga. 2021), in FDA's evaluation of Florida's proposal. The record, in fact, supports a contrary conclusion. Given the "reasonable explanations for [FDA's] actions," the sixth *TRAC* factor actually "weighs in Defendants' favor." *Kussem v. Blinken*, No. 21-CV-1441 (TSC), 2022 WL 670831, at *6 (D.D.C. Mar. 7, 2022).

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion for Partial Summary Judgment on Counts One and Four.

January 17, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

HILARY K. PERKINS
Assistant Director
Consumer Protection Branch

*/s/ James W. Harlow*
JAMES W. HARLOW
Senior Trial Attorney

*/s/ Kimberly R. Stephens*
KIMBERLY R. STEPHENS
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044-0386
(202) 514-6786 (Harlow)
(202) 305-0033 (Stephens)
James.W.Harlow@usdoj.gov
Kimberly.R.Stephens@usdoj.gov

MARCIA BERMAN
Assistant Director
Federal Programs Branch

*/s/ Olivia Hussey Scott*
OLIVIA HUSSEY SCOTT
Senior Counsel
Federal Programs Branch

OF COUNSEL:

SAMUEL R. BAGENSTOS
General Counsel
U.S. Department of Health and Human Services

MARK RAZA
Chief Counsel

WENDY VICENTE
Deputy Chief Counsel, Litigation

SARAH ROSENBERG
Assistant Chief Counsel

WILLIAM THANHAUSER
Associate Chief Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Ave.
White Oak 31
Silver Spring, MD 20993-0002

Civil Division
U.S. Department of Justice
1100 L Street, N.W., Room 11115
Washington, D.C. 20005
Telephone: (202) 616-8491
Fax: (202) 616-8470
Email: Olivia.Hussey.Scott@usdoj.gov